**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
Phillip Kim, Esq.
Michael Cohen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: philkim@rosenlegal.com
Email: mcohen@rosenlegal.com

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LUIS FERNANDEZ AND MARK PRICE, Individually and on behalf of all others similarly situated, | Case No: 25-cv-02305-PKC-JRC |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | FIRST AMENDED CLASS ACTION COMPLAINT |
| NIKE, INC., | |
| Defendant. | |

Plaintiffs Luis Fernandez and Mark Price ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendant Nike, Inc. ("Defendant"), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendant's public statements, social media posts, authorities, media reports, websites, and other publicly available reports and information about the Defendant and The Nike NFTs (defined below), and information readily obtainable on the

Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery. Plaintiffs hereby allege as follows:

## **INTRODUCTION**

1. In the crypto world, a "rug pull" is when a promoter abruptly abandons a project after raising assets, leaving investors holding the bag.

2. In one scenario known as a "soft rug pull," investors buy crypto assets with the expectation that the promoter will continue to market the project and increase the interest in and value of the crypto assets, but the promoter shuts the project down instead.

3. The scenario is all too common, unfortunately, warranting caution when buying tokens in reliance on the continuing marketing efforts of unscrupulous crypto promoters.

4. One does not expect it from Nike, however, the international sports juggernaut with yearly revenue of around $50 billion. But that is what Nike did.

5. Plaintiffs and class members purchased Nike-themed non-fungible tokens (often shortened to NFTs), crypto collectibles, or other crypto assets ("The Nike NFTs") from a Nike subsidiary called RTFKT, Inc. ("RTFKT") which Nike had acquired to capitalize on the crypto bull market in late 2021.

6. The Nike NFTs were designed to be traded, peer-to-peer, on the secondary market. In addition to the secondary market sales (of which Nike took a cut), Nike created a gamified ecosystem in which the Nike NFTs could be used to complete challenges and quests to reveal rewards and earn prizes, including limited edition, real-life Nike products. The prospect of these prizes and rewards, in turn, provided value to the Nike NFTs, stimulating demand, eliciting secondary market trading and, for a time, rising prices.

7.      In short, Nike used its iconic brand and marketing prowess to hype, promote, and prop up the unregistered securities that RTFKT sold.

8.      Because The Nike NFTs derived their value from the success of a given promoter and project – here, Nike and its marketing efforts – investors purchased this digital asset with the hope that its value would increase in the future as the project grows in popularity based on the Nike brand.

9.      As this type of digital asset is properly classified as a security under relevant (including federal) law, the issuers of this type of token are required to register them and file relevant statements with the authorities (including the U.S. Securities Exchange Commission (the "SEC")) and comply with relevant (including federal) securities laws. The Nike NFTs were never registered as such.

10.     What is more, after capitalizing on the boom in crypto assets, Nike caused the rug to be pulled out from under the Nike NFTs. In December of 2024, RTFKT announced on its official twitter page that it was winding down operations (in a twitter post from the official RTFKT twitter account entitled, strangely enough, "A New Chapter for RTFKT").

11.     Investors were decimated. With the end of RTFKT and, by extension, Nike's many targeted promotional initiatives aimed at hyping up the Nike NFTs and stimulating demand, the reason that so many had purchased the Nike NFTs – to complete quests to gain access to additional NFTs or physical Nike products, and/or to resell the Nike NFTs on the secondary market to others – evaporated instantly.

12.     Predictably, prices plunged and did not recover. Investors – some of whom are cited in this complaint – and the crypto community at large lamented Nike's brazen rug pull.

13.    Plaintiffs and others would never have purchased the Nike NFTs at the prices they did, or at all, had they known that the Nike NFTs were unregistered securities or that Nike would cause the rug to be pulled out from under them.

14.    As a result of Nike's promotion of the unregistered securities and also its rug pull, Plaintiffs and the Class – many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investment in The Nike NFTs and were denied the information that would have been contained in the materials required for the registration of The Nike NFTs – have suffered significant damages in an amount to be proven at trial.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because at least one plaintiff and defendant are citizens of different states).

16.    This Court may exercise personal jurisdiction over the Defendant because Defendant maintains business in this District, maintains and has continuous and systematic contacts with this District, does substantial business in this State and within this District, and engaged in unlawful practices in this District as described in this Complaint, so as to subject themselves to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

17.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c) and 18 U.S.C. § 1965. Defendant engaged in the misconduct in this Judicial District and promoted,

advertised, and hyped up The Nike NFTs in this Judicial District. Moreover, subsequent damages took place in this Judicial District.

18.     Venue and jurisdiction are additionally proper in this District because many of the acts complained of originated and/or occurred, at least in part, in this Judicial District. Further, Defendant sought investors for the Nike NFTs in this Judicial District and encouraged their investment.

## PARTIES AND RELEVANT NON-PARTIES

19.     Plaintiff Luis Fernandez is a natural person and resident of Texas. Plaintiff Fernandez, along with other members of the Class, purchased the Nike NFTs, unregistered securities, and were subject to Defendant's deceptive acts and practices promoting them.

20.     Plaintiff Mark Price is a natural person and resident of New York. Plaintiff Price, along with other members of the Class, purchased the Nike NFTs, unregistered securities, and were subject to Defendant's deceptive acts and practices promoting them.

21.     Defendant Nike, Inc. is a corporation organized under Oregon law. It is a major international footwear, athletics and apparel corporation with revenues of approximately $50 billion per year. Nike's Swoosh is iconic and one of the most recognized logos in the world.

22.     RTFKT, Inc. is a corporation organized under Delaware law. RTFKT purports to have "emerged not as another corporate venture, but as a digital renaissance powered by creative chaos." RTFKT partners with brands and others to issue digital crypto assets. RTFKT was acquired by Nike in December of 2021. RTFKT is a separate corporate entity and brand from Nike, and it is not Nike's alter ego or agent.

# BACKGROUND

## *Brief Overview of Crypto Assets*

23.     Crypto assets are digital assets designed to function as a medium of exchange, a store of value, or both.

24.     Crypto assets rely on a variety of cryptographic principles to secure transactions, control the creation of additional units, and authenticate the transfer of digital assets.

25.     Bitcoin was the world's first cryptocurrency.  It is also the world's largest and most popular cryptocurrency, with a market capitalization over $2 trillion. Bitcoin was the fastest asset to reach a $1 trillion market capitalization, which it achieved in only twelve years.[1]

26.     At the core of Bitcoin is a public ledger that tracks the ownership and transfer of every unit of bitcoin. The ledger is known as a blockchain.

27.     Blockchains stand at the core of crypto assets. While their technical protocols vary, blockchains are generally designed to achieve similar goals of decentralization and transparency.

28.     Accordingly, blockchains are designed as a framework of incentives that encourage people to do the work of validating transactions. In the case of Bitcoin, those engaged in the validation must solve a "Proof of Work" mathematical problem by expending computational resources. The first person to solve the "Proof of Work" problem is rewarded in newly minted bitcoin. This process is known as "mining" bitcoin.

29.     Mining is one method of acquiring cryptocurrencies like bitcoin. Another is simply to buy cryptocurrencies from another party, typically on an online cryptocurrency exchange.

30.     While bitcoin was the only cryptocurrency listed on the exchanges shortly

---

[1] Because the term "bitcoin" can refer to the system as well as the unit of exchange, the accepted practice is to use "Bitcoin" to refer to the system, and "bitcoin" to refer to the units of exchange or currency.

following its creation in 2009, there are now an ever-growing array of thousands of cryptocurrencies and other digital assets. Following the surge in cryptocurrency interest in recent years, the market capitalization of major cryptocurrencies has reached well over $3 trillion.

31.     Bitcoin is a commodity, and not a security, because it allows for fast and secure transactions, can serve as a long-term store of value, and is decentralized. Critically, Bitcoin is free from any government or private control. There is no entity behind Bitcoin that can cause the price of bitcoin to increase through prudent management or decrease through mismanagement. Rather, the cost of bitcoin is determined solely by market forces, and one buying bitcoin is not investing in a common enterprise. It is Bitcoin's decentralized nature that makes it a non-security under the law.

32.     Ethereum is the second-most popular cryptocurrency, with a market capitalization that is currently close to $300 billion. Ethereum uses a blockchain similar to that used by Bitcoin.

33.     Unlike Bitcoin, however, Ethereum was designed to enable "smart contract" functionality. A smart contract is code that verifies and enforces the negotiation or performance of a contract. Smart contracts can be self-executing and self-enforcing, potentially lowering the transaction costs associated with traditional contracting.

34.     The customizable nature of Ethereum makes it suitable for a variety of uses, including the creation of unique assets such as NFTs. The Nike NFTs at issue here reside on the Ethereum blockchain.

*SEC's Approach to Crypto Assets*

35.     Aside from Bitcoin and Ethereum, there are myriad cryptocurrencies and fungible and nonfungible crypto assets that are securities, like The Nike NFTs.

36.     Moreover, the definitions of "security" in Section 2(a)(1) of the Securities Act of

7

1933 (the "Securities Act"), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

37.     Along these lines, in *Reves v. Ernst & Young*, the United States Supreme Court stated:

> The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' … Congress therefore did not attempt precisely to cabin the scope of the Securities Acts … Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment.

494 U.S. 56, 60–61 (1990).

38.     Crafted to contemplate not only known securities arrangements in existence at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible so as to capture new instruments that share the common characteristics of traditional securities. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in *Superintendent of Insurance v. Bankers Life and Casualty Co.*:

> We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.

404 U.S. 6, 14 n.7 (1971) (quoting *A. T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir. 1967)).

39.     Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings, in the same way it has by federal courts across the country since *Howey*, which the Supreme Court adopted over 75 years ago.[2] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test holds that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[3] The *Howey Test* is the principal method used by federal courts, as well as the SEC, to determine if a given digital asset is a security

40.     The SEC has used multiple distribution channels to share its message and concerns regarding crypto assets, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade. The SEC first made investors aware of the dangers of investing in digital assets in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies"[4]

41.     A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[5]

42.     In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether

---

[2] *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).
[3] *Id.*
[4] https://web.archive.org/web/20240227124314/https://www.sec.gov/investor/alerts/ia_virtualcurrencies.pdf.
[5] https://web.archive.org/web/20241121143702/https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/investor-39.

("ETH") over a one-month period in 2016.[6]

43.     The SEC applied the *Howey* Test to the DAO tokens and concluded that they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").[7] While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO assets, the SEC chose to release the report "to advise those who would use a Decentralized Autonomous Organization ('DAO Entity'), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[8]

44.     In 2019, the SEC released a "Framework for 'Investment Contract' Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[9]

45.     In addition, the SEC has publicized its position on digital assets, including cryptocurrencies, NFTs, and exchanges, in countless enforcement actions,[10] multiple speeches,[11] Congressional testimony,[12] and several official SEC statements[13] and proclamations.[14] The former

---

[6]
https://web.archive.org/web/20240828093936/https://www.sec.gov/files/litigation/investreport/34-81207.pdf.
[7] *Id*.
[8] *Id*.
[9] https://web.archive.org/web/20241121144150/https://www.sec.gov/about/divisions-offices/division-corporation-finance/framework-investment-contract-analysis-digital-assets.
[10] https://web.archive.org/web/20241121144249/https://www.sec.gov/securities-topics/crypto-assets.
[11] https://web.archive.org/web/20241121144340/https://www.sec.gov/newsroom/speeches-statements/gensler-aspen-security-forum-2021-08-03.
[12] https://web.archive.org/web/20241121144436/https://www.sec.gov/newsroom/speeches-statements/gensler-2021-05-26.
[13] https://web.archive.org/web/20241121144700/https://www.sec.gov/newsroom/speeches-statements/statement-clayton-2017-12-11.
[14] https://web.archive.org/web/20241121144729/https://www.sec.gov/newsroom/speeches-statements/enforcement-tm-statement-potentially-unlawful-online-platforms-trading-digital-

SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[15] warning that their failure to register with the SEC may violate U.S. securities laws. In one interview, Chair Gensler said:

> The law is clear, it's not about waving a wand. Congress spoke about this in 1934 … When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that.[16]

46.     On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[17] Chair Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[18] Chair Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[19]

47.     Importantly, the judicial record supports Chair Gensler's assertions. The SEC has taken over 100 successful crypto-related enforcement actions.[20]

48.     While the view of the SEC – traditionally the expert agency in the area of securities regulation – can be persuasive, there are other times when it is not. For instance, the Staff Statement on Meme Coins that the SEC Division of Corporation Finance published on February 27, 2025,

---

assets.

[15] https://web.archive.org/web/20230327041638/https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec.

[16] *Id.*

[17] https://web.archive.org/web/20241121145059/https://www.sec.gov/newsroom/speeches-statements/gensler-sec-speaks-090822#_ftnref3.

[18] *Id.*

[19] *Id.*

[20] https://web.archive.org/web/20241003051605/https://www.cornerstone.com/wp-content/uploads/2023/01/SEC-Cryptocurrency-Enforcement-2021-Update.pdf.

while somewhat cursory, does not appear to be consistent with how district courts in New York and elsewhere have applied the *Howey* tests to crypto assets. Ultimately, the decision whether any asset (including crypto asset) satisfies the *Howey* test is, of course, a judicial one. It is a decision a court must make.

49.     What follows are brief examples and summaries of cases that will help inform this litigation.

*U.S. Sec. & Exch. Comm'n v. KIK*

50.     In *U.S. Sec. & Exch. Comm'n v. Kik Interactive Inc.*[21], the SEC's complaint, filed in the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. 1:19-CV-05244 (S.D.N.Y), Dkt. No. 1. Kik argued, among other things, that the SEC's lawsuit against it should be considered "void for vagueness."[22] *See U.S. Sec. & Exch. Comm'n v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 176 (S.D.N.Y. 2020).

51.     The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts, therefore of securities, and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. *Id.* The court further found that Kik's private and public token sales were a single integrated offering. *Id.* at 181-82.

*SEC v. Telegram*

---

[21] https://web.archive.org/web/20241121145332/https://www.sec.gov/newsroom/press-releases/2020-262.
[22]
https://web.archive.org/web/20241121145524/https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/.

52.     In *U.S. Sec. & Exch. Comm'n v. Telegram Group Inc., et al.*,[23] the SEC filed a complaint on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. 1:19-cv-9439 (S.D.N.Y), Dkt. No. 1. The SEC sought to enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws. *Id*.

53.     On March 24, 2020, the court in the Southern District of New York issued a preliminary injunction barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully. *Id*. Dkt. No. 227.

54.     In applying the *Howey* test to the tokens at issue, the court noted that "[d]isclaimers, if contrary to the apparent economic reality of a transaction, []are not dispositive." *Id*. Dkt. No. 227 at 14 (citing *S.E.C. v. SG Ltd.*, 265 F.3d 42, 48, 54 (1st Cir. 2001) (finding investment contract despite promoter's language cautioning investors that the virtual shares were only intended as part of a video game)).

55.     Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. *Id*. Dkt. No. 242. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. *Id*. It also ordered Telegram to pay a civil penalty of $18,500,000. *Id*. For the next three

---

[23] https://web.archive.org/web/20241121150530/https://www.sec.gov/newsroom/press-releases/2020-146.

years, Telegram was further required to give notice to the SEC staff before participating in the issuance of any digital assets. *Id.*

*U.S. Sec. & Exch. Comm'n v. BlockFi*

56.     In *BlockFi Lending LLC*,[24] the first SEC case involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.[25]

57.     BlockFi argued for "increased regulatory clarity" but lost.[26]

58.     To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days.[27] BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.[28]

*U.S. Sec. & Exch. Comm'n v. TerraForm Labs Pte. Ltd.*

59.     In *U.S. Sec. & Exch. Comm'n v. Terraform Labs PTE, Ltd. and Do Hyeong Kwon*, on July 31, 2023, Judge Jed Rakoff of the Southern District of New York entered an order denying a motion to dismiss claims that defendants, a crypto-assets company and its founder, were

---

[24] https://web.archive.org/web/20241121150850/https://www.sec.gov/newsroom/press-releases/2022-26.
[25] *Id.*
[26] https://web.archive.org/web/20220214161936/https://blockfi.com/pioneering-regulatory-clarity.
[27] https://web.archive.org/web/20241121150850/https://www.sec.gov/newsroom/press-releases/2022-26.
[28] *Id.*

responsible for a multibillion-dollar fraud that involved the development, marketing, offer and sale of crypto-assets that the SEC alleged were unregistered securities. 684 F. Supp. 3d 170.

60.     Judge Rakoff explicitly rejected a key component of his colleague, Judge Analisa Torres' reasoning in her order on cross-motions for summary judgment in *U.S. Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, et al., No. 1:20-cv-10832, Dkt. No. 874 (S.D.N.Y. July 13, 2023), which drew a distinction between crypto assets sold directly by the issuer or on the secondary market. 684 F. Supp. 3d at 197-98.

61.     Judge Rakoff is a highly regarded jurist who is considered an expert in securities law and business law. In fact, Todd Baker, an attorney and Senior Fellow at the Richman Center for Business, Law & Public Policy at Columbia Business and Law Schools called Judge Rakoff, in a *Financial Times* article, the "most respected securities authority in the federal judiciary."[29]

62.     Judge Rakoff also explicitly rejected a key element of Judge Torres' analysis in the Ripple decision, stating:

> It may also be mentioned that the Court declines to draw a distinction between these coins based on their manner of sale, such that coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not. In doing so, the Court rejects the approach recently adopted by another judge of this District in a similar case, *SEC v. Ripple Labs Inc.*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023).

684 F. Supp. 3d at 197.

63.     Judge Rakoff went on to explain that *Howey* and its progeny never made such a distinction, nor does it matter, for purposes of *Howey* analysis, whether a purchaser "bought the coins directly from the defendants or, instead, in a secondary resale transaction." *Id.*

64.     The jury later found defendants liable for securities fraud relating to the tokens at

---

[29] https://web.archive.org/web/20241121150949/https://www.ft.com/content/5e5a3c4a-7508-4db8-ab23-1ff17c87c880.

issue in that case.

*U.S. Sec. & Exch. Comm'n v. Coinbase*

65.    In *U.S. Sec. & Exch. Comm'n v. Coinbase, Inc.*,[30] on June 6, 2023 the SEC charged Coinbase with "operating its crypto asset trading platform as an unregistered national securities exchange, broker, and clearing agency" and "failing to register the offer and sale of its crypto asset staking-as-a-service program." *See* 1:23-CV-04738 (S.D.N.Y.), Dkt. No. 1.

66.    Judge Katherine Polk Failla of the Southern District of New York denied the Coinbase defendants' motion for judgment on the pleadings with respect to all but one claim, finding "the SEC has sufficiently pleaded that Coinbase operates as an exchange, as a broker, and as a clearing agency under the federal securities laws, and, through its Staking Program, engages in the unregistered offer and sale of securities." *U.S. Sec. & Exch. Comm'n v. Coinbase, Inc.*, No. 23 CIV. 4738 (KPF), 2024 WL 1304037, at *35 (S.D.N.Y. Mar. 27, 2024).[31]

67.    Judge Failla also found that the SEC had pleaded "control person liability" for Coinbase Global. *Id.*

68.    While the SEC has apparently exercised its discretion and agreed to drop the case "as a policy matter," *see SEC v. Coinbase*, 23-cv-04738-KPF, Dkt. No. 178 (S.D.N.Y. Feb. 28, 2025) the move is highly unusual and likely to be viewed with suspect, given that a court has already denied defendants' motion to dismiss the action based on the federal securities laws.

*U.S. Sec. & Exch. Comm'n v. Payward Ventures, Inc. (Kraken)*

69.    In *U.S. Sec. & Exch. Comm'n v. Payward, Inc.*, on November 20, 2023 the SEC

---

[30] https://web.archive.org/web/20241121151112/https://www.sec.gov/newsroom/press-releases/2023-102.

[31] The court only granted the motion as to the SEC's claim that Coinbase acted as an unregistered broker through its "Coinbase Wallet" service. 2024 WL 1304037, at *33.

filed a complaint charging "Payward Inc. and Payward Ventures Inc., together known as Kraken, with operating Kraken's crypto trading platform as an unregistered securities exchange, broker, dealer, and clearing agency."[32]

70.     In a recent order by Judge William H. Orrick of the Northern District of California denying Kraken's motion to dismiss the SEC's Complaint, Judge Orrick found that the SEC plausibly alleged Kraken offered or sold crypto assets on Kraken as investment contracts, which were therefore plausibly alleged to be unregistered securities. *U.S. Sec. & Exch. Comm'n v. Payward, Inc*., No. 23-CV-06003-WHO, 2024 WL 4511499 (N.D. Cal. Aug. 23, 2024), *motion to certify appeal denied sub nom. SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v. PAYWARD, INC., et al., Defendants. Additional Party Names: Kraken*, No. 23-CV-06003-WHO, 2024 WL 4819259 (N.D. Cal. Nov. 18, 2024).

71.     In doing so, the court rejected, as numerous other courts have, Kraken's argument that an investment contract requires a "formal contract" or "post-sale obligations" from the issuer to the purchaser who bought the token on a secondary marketplace, like Kraken. *Id*. at *8.

72.     The court was clear that investment contracts are not limited to formal contracts and that the Howey test applies regardless of whether that transaction is on a primary or secondary market. *Id*. at *8-*18.

73.     Further, the court found the SEC to have plausibly alleged vertical commonality, and thus common enterprise, because the promoters of some crypto assets on Kraken allegedly retain ownership or control over billions of the tokens they promote. *Id*. at *14-16.

---

[32] https://web.archive.org/web/20241122153934/https://www.sec.gov/enforcement-litigation/litigation-releases/lr-25896.

*Donovan v. GMO-Z.COM Trust Company, Inc.*

74.     In *Donovan v. GMO-Z.COM Trust Company, Inc.*, plaintiffs alleged that a digital asset known as a stablecoin constituted an unregistered security. *See* 23-cv-08431-AT (S.D.N.Y).

75.     On February 17, 2025, the court held that plaintiffs had stated a claim under New York's General Business Law ¶349 and California's Unfair Competition Law (UCL), the same claims brought here. In particular, the court found that plaintiffs had alleged deceptive acts and practices and false advertising under New York and California state law, even while the court dismissed the federal law claims. *Donovan v. GMO-Z.COM Trust Company, Inc.*, 23-cv-08431-AT, Dkt. No. 121 (S.D.N.Y Feb. 17, 2025).

*Relevant Law Regarding Non-Fungible Tokens or NFTs*

76.     A non-fungible token is "a unique digital item stored on a blockchain. NFTs can represent almost anything, and serve as a digital record of ownership."

77.     The relevant caselaw finding crypto assets to be unregistered securities extends to NFTs as well, as briefly discussed below.

*U.S. Sec. & Exch. Comm'n v. Stoner Cats 2 LLC*

78.     In *Stoner Cats*,[33] the SEC issued an order instituting cease-and-desist proceedings and making findings, and imposing a cease-and-desist order[34] on September 13, 2023 and eventually settled with Stoner Cats 2 LLC for conducting an unregistered offering of securities in the form of NFTs called Stoner Cats. In the press release announcing the charges against Stoner Cats 2 LLC (SC2), Gurbir S. Grewal, former Director of the SEC's Division of Enforcement,

---

[33] https://web.archive.org/web/20241121151708/https://www.sec.gov/newsroom/press-releases/2023-178.

[34] https://web.archive.org/web/20240904043245/https://www.sec.gov/files/litigation/admin/2023/33-11233.pdf.

stated: "Regardless of whether your offering involves beavers, chinchillas or animal-based NFTs, under the federal securities laws, it's the economic reality of the offering – not the labels you put on it or the underlying objects – that guides the determination of what's an investment contract and therefore a security."[35]

79.     In the order, the SEC highlighted several aspects of the Stoner Cats offering that revealed that, applying the *Howey* test, "[I]nvestors in Stoner Cats NFTs had a reasonable expectation of obtaining a profit based on SC2's [the issuer] managerial and entrepreneurial efforts."[36]

80.     First, there was a secondary market for Stoner Cats holders to trade and profit off of their NFTs. "In addition, at least 20% of the Stoner Cats NFTs purchased in the offering were resold in the secondary market before the first episode of the Stoner Cats series aired, two days after the offering, and the majority of the NFTs purchased in the offering were resold in the secondary market before the release of the second episode on November 15, 2021."[37]

81.     Second, Stoner Cat NFT "owners" did not actually control the intellectual property associated with Stoner Cats.[38] "While purchasers may 'own' their particular Stoner Cats NFT, SC2 specifically reserved all commercial rights to the underlying intellectual property, including the images of the characters. SC2 hired a contractor to write computer code that produced these unique images from animations created by the primary animator."[39]

---

[35] https://web.archive.org/web/20241121151708/https://www.sec.gov/newsroom/press-releases/2023-178.
[36] https://web.archive.org/web/20240904043245/https://www.sec.gov/files/litigation/admin/2023/33-11233.pdf.
[37] *Id.*
[38] *Id.*
[39] *Id.*

82.     Third, secondary market re-sales of Stoner Cats generated royalties for Stoner Cats 2 LLC. The SEC alleged that "SC2 configured the Stoner Cats NFTs so that it received a 2.5% royalty for each transaction in them on a certain secondary market platform. The royalties created incentives for SC2 to encourage individuals to buy and sell the Stoner Cats NFTs in the secondary market."[40] As well as that "[p]rior to the offering, one of the programmers working for SC2 contacted a platform for trading NFTs to 'verify' the Stoner Cats NFT collection. Doing so ensured that SC2 would receive royalties from resale transactions and, importantly, assured purchasers in the secondary market that they were buying authentic Stoner Cats NFTs. This facilitated secondary market transactions in Stoner Cats NFTs."[41]

*U.S. Sec. & Exch. Comm'n v. Impact Theory*

83.     In Impact Theory,[42] the SEC issued an order instituting cease-and-desist proceedings and making findings, and imposing a cease-and-desist order[43] on August 28, 2023, where the SEC charged, and subsequently settled with, Impact Theory, for conducting an unregistered offering of securities in the form of NFTs. The SEC alleged that the three tiers of NFTs offered and sold by the company, known as KeyNFTs, were unregistered investment contracts, per *Howey*. Therefore, the SEC alleged that "purchasers in the KeyNFT offering had a reasonable expectation of obtaining a future profit based on Impact Theory's managerial and entrepreneurial efforts."[44]

---

[40] *Id*.
[41] *Id*.
[42] https://web.archive.org/web/20241121152314/https://www.sec.gov/newsroom/press-releases/2023-163.
[43] https://web.archive.org/web/20241001101957/https://www.sec.gov/files/litigation/admin/2023/33-11226.pdf.
[44] *Id*.

84. Among other factors, the SEC noted that investors could realize their profit from selling their NFTs on the secondary market. KeyNFTs could be traded on secondary trading platforms and the company promoted this fact. "Impact Theory stated on its websites and social media channels that KeyNFTs could be purchased and sold on two such secondary market platforms. Impact Theory programmed the smart contract for the KeyNFTs so that the company received a 10% 'royalty' on each secondary market sale."[45]

*Dufoe v. DraftKings, Inc.*

85. In *Dufoe v. Draftkings, Inc et al.*, a proposed class action currently proceeding in the District of Massachusetts, the plaintiff alleged that DraftKings violated federal securities law by selling unregistered securities in the form of NFTs on the DraftKings Marketplace. 23-CV-10524-DJC (D. Mass.).

86. On July 2, 2024, Judge Denise J. Casper denied defendants' motion to dismiss. Judge Casper found that the plaintiff had "plausibly pled that DraftKings NFTs were investment contracts, and thus securities within the meaning of the Securities Act and Exchange Act." *Dufoe v. DraftKings Inc.*, 23-CV-10524-DJC, 2024 WL 3278637, at *10 (D. Mass. July 2, 2024.

87. Judge Casper found that plaintiff had sufficiently alleged horizontal commonality, therefore satisfying the common enterprise prong of *Howey*, because pooling occurred when the "revenue generated by the sale of NFTs was reinvested into DraftKings' business, including through promotion of the Marketplace." *Id.* at *4-6.

88. In this way, Judge Casper followed the holding in *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422 (S.D.N.Y. 2023), a similar case that also found the NFTs at issue to constitute securities under the *Howey* test.

---

[45] *Id.*

89. Next, the court in *DraftKings* found that plaintiff had plausibly alleged the reasonable expectation of profits from his NFT purchase through the theory of capital appreciation in that "the value of existing NFTs is driven upwards if DraftKings maintains investor interest and demand in the Marketplace." *Id*. at *7-9.

90. Finally, the court found that plaintiff had plausibly alleged that the profits were expected solely from the efforts of others because the NFTs values were dependent on the success of the DraftKings Marketplace, even though the NFTs were not minted on DraftKing's proprietary blockchain. *Id*. at *9-10.

*Harper v. O'Neal*

91. In *Harper v. O'Neal*, the plaintiff filed a class action suit in the Southern District of Florida, against Shaquille O'Neal, Astrals LLC, Astrals Holding, LLC, and Astrals Operations LLC for their promotion, offer, and sale of unregistered securities in the form of Astrals NFTs and Galaxy tokens created by the Astrals project. 1:23-cv-21912 (S.D. Fla.).

92. On August 16, 2024, Judge Federico A. Moreno denied defendants' motion to dismiss claims that the Astrals NFTs constituted securities under the *Howey* test and applicable securities law and that Defendant O'Neal was a statutory seller engaged in the solicitation of sales of those unregistered securities. *Harper v. O'Neal*, 23-21912-CIV, 2024 WL 3845444 (S.D. Fla. Aug. 16, 2024).

## RELEVANT FACTUAL ALLEGATIONS

*Nike Purchases RTFKT in an Attempt to Capitalize on the Red Hot Market for Crypto*

93. On December 13, 2021, Nike announced that it was purchasing the NFT company RTFKT (pronounced "artifact").

94. While the terms of the deal were not disclosed, RTFKT had raised an $8 million

seed round, led by capital market company Andreessen Horowitz that had valued the company at $33.3 million, earlier in the year.

95.     In its press release, Nike touted RTFKT as "a pioneering and innovative brand that redefines the boundaries of physical and digital value[.]"

96.     Nike's President and CEO, John Donahoe, stated: "This acquisition is another step that accelerates Nike's digital transformation and allows us to serve athletes and creators at the intersection of sport, creativity, gaming and culture. We're acquiring a very talented team of creators with an authentic and connected brand. Our plan is to invest in the RTFKT brand, serve and grow their innovative and creative community and extend Nike's digital footprint and capabilities."

97.     In addition, RTFKT co-founder, Benoit Pagotto, commented: "This is a unique opportunity to build the RTFKT brand and we are excited to benefit from Nike's foundational strength and expertise to build the communities we love."

*Nike Made Money on Both the Initial Sales and Secondary Sales of the Nike NFTs, Giving Nike Incentive to use its Iconic Brand and Marketing Prowess to Prop Up the Market for Nike NFTs*

98.     Investors could buy Nike NFTs directly from RTFKT on crypto platforms such as the popular NFT marketplace, OpenSea.

99.     Once the investor bought the Nike NFT, the Nike NFT was instantaneously liquid and could be resold with only a few click strokes, potentially at a profit, on the secondary marketplace.

100.    When the Nike NFTs traded hands in the secondary marketplace, peer-to-peer, Nike and RTFKT profited on each secondary transaction. RTFKT would take a transaction fee, also known as a transfer fee, of either 5% or 10% of the secondary sale price, depending on the NFT,

and remit some portion of that to Nike.

101. Thus, when prices of the Nike NFTs trading on the secondary market increased, the fees that Nike received increased as well. These fees incentivized Nike to encourage individuals to trade actively on the secondary market, in which Nike targeted its promotions and other initiatives aimed at stimulating and maintaining demand for the Nike NFTs.

*For a Time, Investors Pile into the Nike NFTs and Sales and Prices in the Secondary Market Soar*

102. Just like the market for all things crypto in late 2021 and early 2022, the early results were impressive and investors were seeing dollar signs.

103. April 2022 marked the first drop of the so-called "Nike Cryptokicks," with 20,000 NFTs of Nike's Dunk Genesis shoes hitting the market.

104. These "Nike Cryptokicks" traded immediately for thousands of dollars on the NFT platform OpenSea, with some even changing hands for six-figure sums.

105. Eager to ride the crypto wave and driven by the established appeal of the Nike brand, investors piled into Nike NFTs, which were often emblazoned with the iconic Nike swoosh.

106. By 2023, Nike had already raked in tens of millions of dollars in revenue from the Nike NFTs, exploiting the legendary status of the Nike brand and its iconic Swoosh. Secondary trading of the Nike NFTs is believed to have surpassed $1 billion.

107. Nike carefully limited the market supply of Nike NFTs to build hype, manufacture scarcity and to encourage active secondary trading of the crypto assets. Nike would also spread out drops of the Nike NFTs, and its promotions tied to the Nike NFTs, throughout the year to keep demand high and investors trained on the secondary marketplace.

108. In addition, Nike would offer special rewards to investors for completing special challenges or quests, in a further attempt to maintain the interest and price level in the marketplace

for Nike NFTs.

109.     Time and time again, the marketplace responded to promotional initiatives by Nike, illustrating that it was the actions of Nike that drove the price of the Nike NFTs.

110.     For instance, Nike would set "forgings," which were special time windows in which owners of certain Nike NFTs were eligible to order exclusive, limited edition, physical Nike shoes. When Nike held a forging in October of 2023, it caused the price of the relevant Nike NFTs to spike by over 600% month-over-month.

*The Rug is Pulled Out From Under the Nike NFTs, Decimating Investors*

111.     On December 2, 2024, RTFKT abruptly announced that it was closing down by releasing a tweet from its official twitter account. The tweet stated, inter alia: "Today, we're announcing the plan to wind down RTFKT operations… While we expect our web3 services will be winding down by the end of January 2025, the spirit of innovation that RTFKT represents will live on through the countless creators and projects it has inspired."

112.     Following the announcement, the price of the Nike NFTs plummeted, and has not recovered.

113.     NFT investors were shocked and sustained immediate losses in their Nike NFTs. For instance, one crypto news source ran an article entitled, *What Happened to RTFKT? Investors Demand Accountability*, writing: "RTFKT has officially announced its shutdown, leaving the NFT community in turmoil. This domino effect also raised concerns about the fate of flagship projects like Clone X and INVTRY. Investors are now grappling with significant financial losses, while speculations swirl about Nike's reasoning and financial decisions. Here's what happened…" https://cryptoticker.io/en/nike-ends-rtfkt-investors-left-speechless/.

114.     The tweet announcing RTFKT's closure has been viewed over 3 million times and

elicited over 1,000 comments, with many commenters bemoaning what they view as a brazen "rug pull."

115. In the crypto world, a "rug pull" is when promoters abruptly abandon a project after raising assets, leaving investors holding the bag.

116. As Coinbase explains in an article entitled: *What is a rug pull and how to avoid it?*, posted in the "tips and tutorials" section of its website: "A rug pull is a scenario in the cryptocurrency space. It involves a team raising assets from the public by selling a token, only to abruptly shut down the project or disappear, taking the raised assets with them. This leaves the participants, or rather, their victims, with worthless tokens."

117. The article continues: "Rug pulls can be extensively orchestrated, with bad actors leveraging various strategies to lure as many victims as possible. Some scams even use trusted figures to gain trust, while others promise extremely high returns or offer exclusive digital goods."

118. Listing the common types of rug pulls, the articles lists: "Team Exit: The project's team members suddenly disappear or exit, leaving participants with no support and a collapsing token."

119. The article ends with a section entitled "Notable Rug Pulls in History," stating: "While rug pulls have always been a spectacle in the industry, some scams have left a significant mark. Some of the biggest rug pulls in history include OneCoin, Thodex, AnubisDAO, Uranium Finance, and Squid Game Token. These scams resulted in billions of dollars in losses for participants."

120. To quote just some of the outraged responses directed at Nike's rug pool, many of which appear to have been written by dismayed investors holding Nike NFTs as prices plummeted, one twitter user commented that the post was "[a] lot of words to say 'we're rugging.'"

https://x.com/zaimirii/status/1863622427214741609.

121.     Another     twitter     user     commented:     "RUG     COMPLETE."
https://x.com/NFTherder/status/1863698266530955585.

122.     Another opined that it was "the final blow to the slowest nft rug in crypto history,
to  which  another  wrote:  "they  are  bull  posting  about  rugging  the  project…"
https://x.com/WillieBezos/status/1863622262206947462.

123.     Another wrote: "Can't believe we got a Nike rug before GTA6," apparently
referring     to     the     long-awaited     release     of     a     popular     video     game.
https://x.com/MatDefies/status/1863623046432506216.

124.     Another          wrote:          "did          I          get          rugged?"
https://x.com/LiteFlex0x/status/1863622167704846421.

125.     Another wrote: "A rug." https://x.com/blessed2541/status/1863622413822410770.

126.     Another wrote: "@Nike rugged us," to which another user wrote: "Just when we
thought     it     was     only     14-year     olds     that     rug     crypto     projects."
https://x.com/mebigfish/status/1863622678935978128.

127.     Another                         wrote:                         "ruggggged."
https://x.com/kopi_eth_/status/1863621928365535352.

128.     Another wrote: "Nice rug," with an animation of someone slapping a carpet.
https://x.com/T3rran_eth/status/1863625689292808416.

129.     Another decried the fact that now the investors are left "holding the bag."
https://x.com/thetruth4225/status/1863622825153900826.

130.     Another wrote: "BIGGEST SOFT RUG IN THE INDUSTRY," to which another
user wrote: "[t]hat didn't feel soft." https://x.com/PendingETH/status/1863629618063773718.

131.   The distinction between a hard and soft rug pull is a known one in the cryptocurrency community. A hard rug pull is when a crypto promoter has no intention to ever complete a project, and can be said to effectively "hardwire" into the project's code a backdoor for the promoter to siphon the investors' assets. In contrast, in a soft rug, investors buy a token relying on the promoter's marketing efforts to grow the project's value, but the promoter shuts it down and makes off with the investors' money.

132.   Another wrote: "Understanding NFTs well, the timing of launching a collection when you see a bull market returning, and then exiting is a total RUG. Do people need it spelled out any clearer? Is the market ever going to wake up to this and call it out?" https://x.com/huuep/status/1863644320508887551.

133.   Another      wrote:      "Rug      pull      you      mean?" https://x.com/uponlyy/status/1863622677879267612.

134.   Another wrote: "They drop a blade on you before they pull the plug, gotta stay classy." https://x.com/whatstheticker/status/1863630138442739744.

135.   Another      wrote:      "Nice      3      year      rug." https://x.com/OttoSuwenNFT/status/1863631849093992612.

136.   Another wrote: "Thank you for everything, I will never buy NIKE shoes again in my life." https://x.com/SPELL_WEB3/status/1863624486207078620.

137.   And that was just a small fraction of the comments on the first day of the announcement.

138.   As all of the above comments make plain, that everyone knew the value of the Nike NFTs would plummet – and did plummet – as soon as Nike stopped supporting the project and propping up the market for Nike NFTs by offering new drops, challenges and rewards – highlights

the fact that it was the continuing managerial efforts of Nike that drove the prices of these NFTs. Accordingly, the Nike NFTs are securities under the *Howey* test.

<strong><u>THE NIKE NFTS ARE UNREGISTERED SECURITIES</u></strong>

139. Under the *Howey* Test, an investment contract is a security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits (4) to be derived from the efforts of others.

140. Applying the *Howey* Test to The Nike NFTs reveals that they qualify as securities:

**1. Investment of Money**

141. As the SEC states in its Digital Asset Framework (the "Framework")[46]: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of traditional (or fiat) currency, another digital asset, or other type of consideration."

142. Investors purchasing Nike NFTs made an investment of money or other valuable consideration for the purposes of the *Howey* Test.

**2. Common Enterprise**

143. The SEC Framework states: "In evaluating digital assets, we have found that a 'common enterprise' typically exists." This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

144. This is true of The Nike NFTs investors. Investors who bought these NFTs are passive participants in the enterprise, with the profits of each investor intertwined with the fate of

---

[46] https://web.archive.org/web/20241121144150/https://www.sec.gov/about/divisions-offices/division-corporation-finance/framework-investment-contract-analysis-digital-assets.

the project. The fortunes of The Nike NFTs investors, and the value of The Nike NFTs, are linked almost entirely to the success of Nike's promotional efforts designed to reward NFT holders and further incentivize NFT ownership. Accordingly, when investors purchase The Nike NFTs, they participate in a common enterprise.

### 3. Expectation of Profit

145.    In terms of "reasonable expectations of profits," the SEC Framework states: "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."[47]

146.    In particular, the SEC's Framework identifies several factors to help assess whether the "reasonable expectation of profits" element is met:

> The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit.
> 1. The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.
> > a. The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.
> > b. This also can be the case where the digital asset gives the holder rights to dividends or distributions.
> 2. The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.
> 3. Purchasers reasonably would expect that an AP's [Active Participant, or promoter] efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.
> 4. The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.[48]

147.    Investors in The Nike NFTs were expecting to profit through the appreciation of

---

[47] *Id.*
[48] *Id.*

their digital assets that could be sold and traded on the secondary market, resulting in an increased return on their purchase. Alternatively, an expectation that the Nike NFTs will entitle the holder to accomplish a quest or participate in a limited edition forge, which will in turn entitle them to valuable consideration, can also constitute an expectation of profit under *Howey* as well.

### 4. Derived from the Efforts of Others

148.     The SEC Framework provides that:

The inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an [Active Participant]? Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?

Although no one of the following characteristics is necessarily determinative, the stronger their presence, the more likely it is that a purchaser of a digital asset is relying on the "efforts of others":

1. An AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

　　a. Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

2. There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

3. An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that:

　　(1) controls the creation and issuance of the digital asset; or

　　(2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

4. An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset. In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

An AP has a continuing managerial role in making decisions about or exercising

judgment concerning the network …[49]

149. Purchasers of The Nike NFTs are entirely reliant on the managerial efforts of others for their potential profits. Indeed, The Nike NFTs' ability to maintain value depends significantly on Nike's reputation and promotional activities, leading the marketing efforts for the Nike NFTs and ensuring that people remain incentivized to buy, hold and trade them.

150. This is due to the centralized nature of this arrangement: it is Nike that controls the rewards, perks and therefore the desirability of owning the Nike NFTs. This is unlike an investment in Bitcoin, for example, which is decentralized and run by no specific persons or entity.

151. The Nike NFTs were and are therefore "securities" as defined by the securities laws and as interpreted by relevant authorities including the Supreme Court, the federal courts, and the SEC.

### *The Class Has Suffered Significant Damages from Defendant's Actions*

152. As a direct result of Nike's conduct promoting and hyping up these unregistered securities, Plaintiffs and the Class – many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in The Nike NFTs, and were denied the information that would have been contained in the materials required for the registration of The Nike NFTs – have suffered significant damages in an amount to be proven at trial.

### EVEN IF THE COURT DOES NOT FIND THAT THE NIKE NFTS ARE UNREGISTERED SECURITIES, PULLING THE RUG OUT FROM UNDER THE NIKE NFTS CONSTITUTES A DECEPTIVE ACT

153. The Court need not find that the Nike NFTs are necessarily unregistered securities to find that the rug pull was a deceptive act.

---

[49] *Id.*

154.    As evident from the mass outrage and outpouring of commentary calling the decision to wind down RTFKT a rug pull, holders of the Nike NFTs felt that the decision left them holding obsolete crypto assets whose value had suddenly evaporated.

155.    The economic reality is telling. If the Nike NFTs were truly being bought as digital collectibles or works of art, this would not be the case. For instance, when an artist dies or otherwise stops producing art, the artist's work typically goes up in value. Collectors do not accuse the artist of pulling the rug out from under them.

156.    But the way in which Nike propped up the value of the Nike NFTs through targeted, limited edition drops and promotions and created a gamified ecosystem in which the NFTs could be used to complete quests and earn prizes including real-life Nike products, is markedly unlike the market for collectibles or art.

157.    As an example, on May 3, 2023, a news article appeared in Yahoo Finance, entitled: *LeBron James Spotted in RTFKT Nike Sneakers—Clone X NFT Holders Rejoice*. *See* https://finance.yahoo.com/news/lebron-james-spotted-rtfkt-nike-165056384.html. The article explains:

> LeBron James, arguably the most famous basketball star today, was photographed wearing special-edition Nike sneakers that can only be purchased by minting an Ethereum NFT created by Nike subsidiary, RTFKT.
> …
> The RTFKT x Nike Air Force 1 Genesis is a set of just 1,776 total pairs of sneakers in that style that can only be obtained by purchasing an NFT and then redeeming it for the physical product. Secondary market prices for the Genesis NFTs start at 0.4 ETH, or $740 on Opensea. The physical sneakers can only be redeemed until May 8, per an official FAQ.

158.    Thus, the reason that the Clone X NFT Holders were rejoicing, to quote the title of the article, is that the promotional efforts of Nike had just boosted the value of their Nike NFTs.

159.    That is just one example of how Nike's promotional activities and limited-time

offers and rewards drove the prices of the Nike NFTs, ensuring growing demand and active trading on the secondary market. This generated both returns for investors and transfer fees for Nike.

160.    Another example is the MNLTH collection, which contained some of the most valuable and highly-prized of the Nike NFTs. MNLTH refers to an NFT depicting a mystery loot box, emblazoned with the Nike Swoosh.

161.    The MNLTH loot boxes, which were distributed to holders of certain tokens, could be unlocked only on certain dates in the future, revealing the contents of the box.

162.    In some instances, the box contained NFT versions of a vial and a Nike sneaker. If the MNLTH box contained a certain limited vial, it would give the Nike NFT sneaker special characteristics, making that Nike NFT much more valuable. In other instances, the MNLTH contained a redemption code that could be used to obtain special, real-life Nike sneakers.

163.    The MNLTH was one form of quest, rewarding holders of Nike NFTs and creating a gamified scavenger hunt of sorts, spurring trading and boosting the value of the Nike NFTs.

164.    With the closing of RTFKT, the reason that so many had purchased the Nike NFTs – to complete Nike's quests to access additional NFTs or physical Nike products, and/or to resell the Nike NFTs on the secondary market to others seeking the same – dried up overnight.

165.    Plaintiffs and others would not have purchased the Nike NFTs at the prices they did, or at all, had they known the rug would be pulled out from under them.

## CLASS ALLEGATIONS

166.    Plaintiffs bring this action as a class action on behalf of a class consisting of all persons who purchased or otherwise acquired The Nike NFTs within applicable limitations periods and were damaged thereby (the "Class"). Excluded from the Class is the Defendant and any entity in which the Defendant has or had a controlling interest.

167.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members in the proposed Class. Plaintiffs believe that Class members may be notified of the pendency of this action by mail, email, or similar messaging as directed by the Court, using the form of notice similar to that customarily used in class actions, including being given an opportunity to exclude themselves from the Class.

168.     Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendant's wrongful conduct in violation of the law that is complained of herein.

169.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

170.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)     whether Defendant violated the law;

b)     whether Defendant's conduct was deceptive;

c)     whether The Nike NFTs constitute securities under relevant law;

d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

171.     A class action is superior to all other methods of fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**
**For Violations of the New York Deceptive Acts and Practices Unlawful Act**
**N.Y. Gen. Bus. Law § 349**

172. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

173. Plaintiffs invested in The Nike NFTs and have been subjected to Defendant's scheme to mislead and deceive the marketplace, and assert this claim on behalf of the Class. Plaintiffs were deceived by Defendant into believing that The Nike NFTs were not (unregistered) securities and had value, and accordingly paid a premium for The Nike NFTs.

174. Defendant engaged in deceptive and unfair practices prohibited by, among others, New York General Business Law § 349; Florida Deceptive and Unfair Trade Practices Act, Florida Stat. § 501.201; and Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.607; by, among other things, leading investors to believe that The Nike NFTs are not securities that should be registered and had value and by promoting them. Defendant took advantage of Plaintiffs' trust and confidence by hyping up and promoting these Nike NFTs.

175. The unfair and deceptive trade acts and practices of Defendant are consumer-oriented, are materially misleading, and have directly, foreseeably, and proximately caused damages and injury to Plaintiffs and the other members of the Class.

176. Much of the of Defendant's acts and practices at issue in this matter were directed at and caused harm to New York and New York residents.

177. As a direct consequence of Defendant's unfair conduct and deception, Plaintiffs and members of the Class have been damaged in that they spent money on The Nike NFTs that they would not have otherwise spent.

178. In addition, Plaintiffs and members of the Class did not receive a lasting value for the Nike NFTs that Nike promoted, and are left in an adverse position due to The Nike NFTs being unregistered with relevant authorities and/or part of an RTFKT marketplace that is now defunct, rendering The Nike NFTs obsolete. Because of Defendant's misleading practices in violation of New York General Business Law § 349, The Nike NFTs are substantially worthless.

179. Defendant's acts and practices amount to acts, uses, or employment by Defendant of deception and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in violation of New York General Business Law § 349, deeming deceptive and unfair acts and practices illegal.

### COUNT II
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 et seq.**

180. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

181. Defendant qualifies as a "person" as defined by California Business and Professions Code section 17201.

182. By engaging in the above-described unfair and unlawful business acts and practices, Defendant committed one or more acts of unlawful or unfair conduct within the meaning of California Business and Professional Code section 17200 (the "UCL"). These acts and practices constitute a continuing and ongoing unlawful business activity as defined by the

UCL, and justify the issuance of an injunction, restitution, and other equitable relief pursuant to the UCL.

183.    Defendant's acts and practices alleged herein constitute a continuing and ongoing unlawful business activity defined by the UCL. Defendant has violated the unlawful prong of the UCL by deceptively promoting unregistered securities in violation of state and federal law.

184.    Defendant's acts and practices alleged herein also constitute a continuing and ongoing unfair business activity defined by the UCL. Defendant's conduct is contrary to the public welfare as it transgresses civil statutes, violates established public policy, including the policies underlying the statutes and laws identified in the preceding paragraph and has been pursued to attain an unjustified monetary advantage for Defendant. Accordingly, Defendant's business practices and acts have been immoral, unethical, oppressive, and unscrupulous, and have caused injury far greater than any alleged countervailing benefit.

185.    Much of Defendant's acts and practices at issue in this matter were directed at and caused harm to California and California residents.

186.    Absent Defendant's acts and practices, Plaintiffs and members of the Class would not have purchased the Nike NFTs at the prices paid, or at all.

187.    As a direct and proximate consequence of the actions identified herein, Plaintiffs and members of the Class have suffered and continue to suffer injury in fact, including but not limited to, economic loss and loss of property.

188.    Plaintiffs seek an order of this Court awarding restitution and injunctive relief and all other relief allowed under the UCL, and such other and further relief as this Court may deem just and proper.

## COUNT III
### Violations of the Florida Deceptive and Unfair Trade Practices Act
### Florida Stat. § 501.201 et seq.

189.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

190.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., et seq. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

191.    Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat.

192.    Defendant is engaged in trade or commerce within the meaning of the FDUTPA.

193.    Much of Defendant's acts and practices at issue in this matter were directed at and caused harm to Florida and Florida residents.

194.    Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

195.    Defendant's unfair and deceptive practices as described herein are objectively likely to mislead – and did mislead – consumers acting reasonably in the circumstances.

196.    Defendant has violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

197.    Plaintiffs and Class members have been aggrieved by Defendant's unfair and deceptive practices.

198.    The harm suffered by Plaintiffs and Class members was directly and proximately caused by the deceptive and unfair practices of Defendant, as more fully described herein.

199.    Absent Defendant's acts and practices, Plaintiffs and members of the Class would not have purchased the Nike NFTs at the prices paid, or at all.

200.    Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and members of the Class make claims for actual damages, attorneys' fees and costs.

**COUNT IV**
**Violations of the Oregon Unlawful Trade Practices Act**
**Or. Rev. Stat. § 646.607**

201.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

202.    This cause of action is brought pursuant to Oregon's Unlawful Trade Practices Act (UTPA), Or. Rev. Stat. § 646.607.

203.    The UTPA states that: "[a] person engages in an unlawful trade practice if in the course of the person's business, vocation or occupation the person: (1) Employs any unconscionable tactic in connection with selling… of… goods or services[.]" Or. Rev. Stat. § 646.607.

204.    Defendant qualifies as a "person" as defined by the UTPA, Or. Rev. Stat. § 646.607.

205.    Defendant's unfair and deceptive practices as described herein constitute an unconscionable tactic in that they are objectively likely to mislead – and did mislead – consumers acting reasonably in the circumstances.

206.     Much of Defendant's acts and practices at issue in this matter were directed at and caused harm to Oregon and Oregon residents.

207.     Plaintiffs and Class members have been aggrieved by Defendant's unfair and deceptive practices.

208.     The harm suffered by Plaintiffs and Class members was directly and proximately caused by the deceptive and unfair practices of Defendant, as more fully described herein.

209.     Absent Defendant's acts and practices, Plaintiffs and members of the Class would not have purchased the Nike NFTs at the prices paid, or at all.

210.     Pursuant to the UTPA, Plaintiffs and members of the Class make claims for actual damages, attorneys' fees and costs.

## COUNT V
## Unjust Enrichment

211.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

212.     Plaintiffs conferred a monetary benefit upon Defendant, and Defendant accepted funds that it knew, or should have known, were derived from the sale of unregistered securities and/or of crypto assets sold via deception.

213.     With Plaintiffs' money, Defendant enriched itself.

214.     Defendant has knowledge of the benefits that Plaintiffs and Class Members conferred on it.

215.     Under principles of equity and good conscience, Defendant should not be permitted to retain the funds and assets received as a result of their misleading promotion of unregistered securities and/or crypto assets sold via deception to the unknowing Plaintiffs.

216.     As a result of Defendant's conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

217.     To the extent permitted by law, Plaintiffs seek restitution of all funds and assets that Defendant has unjustly received as a result of the conduct alleged herein, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable, as well as all other relief the Court deems necessary to make Plaintiffs whole.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

a)     That the Court determine that this action may be maintained as a class action, that Plaintiffs be named as Class Representatives of the Class, that the undersigned be named as Lead Class Counsel of the Class, and direct that notice of this action be given to Class members;

b)     That the Court enter an order declaring that Defendant's actions, as set forth in this Complaint, violate the laws set forth above;

c)     That the Court award Plaintiffs and the Class damages in an amount to be determined at trial;

d)     That the court issue appropriate equitable, rescissionary and any other relief against Defendant to which Plaintiffs and the Class are entitled;

e)     That the Court award Plaintiffs and the Class pre- and post-judgment interest;

f)     That the Court award Plaintiffs and the Class their reasonable attorneys' fees and costs of suit; and

g)     That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: August 11, 2025                    **THE ROSEN LAW FIRM, P.A.**

/s/ Phillip Kim
Laurence M. Rosen, Esq.
Phillip Kim, Esq.
Michael Cohen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: philkim@rosenlegal.com
Email: mcohen@rosenlegal.com

*Counsel for Plaintiffs*