UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

LUIS FERNANDEZ, et al., : 25-CV-02305-PKC

Plaintiffs, :

: United States Courthouse
: Brooklyn, New York

-against- :

: Wednesday, January 21, 2026
: 11:00 a.m.

NIKE, INC., :

Defendant. :

- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE PAMELA K. CHEN
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Plaintiff: THE ROSEN LAW FIRM
275 Madison Avenue, 40th Floor
New York, New York 10016
BY: MICHAEL A. COHEN, ESQ.
PHILLIP KIM, ESQ.

For the Defendant: DLA PIPER LLP
555 Mission Street, Suite 2400
San Francisco, California 94105
BY: MICHAEL FLUHR, ESQ.

For the Defendant: DLA PIPER LLP
1251 Avenue of the Americas
New York, New York 10020
BY: SCOTT R. WILSON, ESQ.

Court Reporter: Nicole J. Sesta, RMR, CRR
Official Court Reporter
Proceedings recorded by computerized stenography. Transcript produced by Computer-aided Transcription.

THE COURTROOM DEPUTY: Civil cause for a motion, 25-CV-2305, Fernandez, et al. versus Nike, Inc. Will the parties please state their appearances for the record, starting with plaintiff.

MR. COHEN: Good morning, Your Honor. This is Michael Cohen from the Rosen Law Firm representing the plaintiffs.

THE COURT: Good morning.

MR. KIM: Good morning, Your Honor. Phillip Kim from the Rosen Law Firm, for the plaintiffs as well.

THE COURT: Good morning.

MR. FLUHR: Good morning, Your Honor. Michael Fluhr from DLA Piper representing defendant Nike.

THE COURT: Good morning to you, Mr. Fluhr.

MR. WILSON: Good morning, Your Honor. Scott Wilson, DLA Piper, for the defendant.

THE COURT: Good morning, Mr. Wilson. So as everyone knows, we're here for argument relating to competing motions, one from defendant, the defendant, rather, to compel arbitration and stay this matter and then -- sorry -- and another motion to dismiss.

I shouldn't say competing, but they are two different motions filed by defendants. What I want to do today, though, is focus on the arbitration issues and specifically who decides arbitrability. I apologize to you

folks, because I imagine you might have prepared for the full array of arguments, everything from arbitrability to the motion to dismiss.

But because the arbitration issues are so central or the threshold issue I need to decide, I would rather focus on that and then, if necessary, I can hear other argument at a later point about the motion to dismiss, if that comes to pass or if I end up resolving that, as well.

But for now, I want to focus on the arbitration question. So I'll certainly hear first from Nike about why they should be able to enforce the arbitration clause that's in the terms and services for -- and this is for the court reporter's benefit -- the word RTFKT is going to be used a lot, but it's spelled R-T-F-K-T. So it's an acronym but it's pronounced "artifact". Why don't we start off with defense counsel by either Mr. Fluhr or Mr. Wilson.

MR. FLUHR: Thank you, Your Honor. With the initial copy, it is Nike's position that plaintiffs -- that Plaintiff Fernandez's stance should be dismissed first for lack of personal jurisdiction. Setting that aside, on the arbitration question, I don't think plaintiffs challenge, I think they concede that they entered into an arbitration agreement with RTFKT that would cover their claims against RTFKT and that the arbitrability of which would be decided by the arbitrator. I don't think plaintiffs contest that.

The question, as Your Honor identified, is whether Nike as a non-signatory can force that under the doctrine of equitable estoppel. Now, as I think both sides agree, it's well established in the Second Circuit that there's a two part test for when a non-signatory like Nike can enforce an arbitration agreement under the doctrine of equitable estoppel.

Part one is whether they have a sufficiently close relationship with the signatory, they were RTFKT's parent company. I don't think there's any dispute about that.

The second prong is whether the claims that are asserted against Nike are intertwined with, and that's the language used in case law, intertwined with. And that means, essentially, arising out of or related to the terms of service or the agreement in which the arbitration provision lives. That comes from cases like Choctaw, Contec, Ragone, all Second Circuit cases. You can also look at *Shepherd versus Belkin*.

THE COURT: Pause for one moment. I think Choctaw has a common spelling. But Contec, for the court reporter's benefit, is C-O-N-T-E-C. Go ahead.

MR. FLUHR: Yes, Your Honor. So in this case, the claims here are deeply intertwined with the underlying agreement. So, again, whether that prong is met, whether those claims are intertwined with the underlying agreement, here the terms of service, that is a broad standard. Again,

it's whether the claims are arising out of or related to that underlying agreement.

So here the fact alone that the plaintiffs purchased the NFTs pursuant to that agreement, agreed to that agreement, which governed the services, that alone would meet the intertwined prong.

It really goes further. The claims are even further intertwined. Essentially, what plaintiffs allege is that the services that were to be provided by Nike, or RTFKT, and I think it's a little unclear from plaintiff's compliant, renders the NFT securities and the discontinuation of those services constitutes some sort of a deceptive practice.

Now, when you look at the terms of service, the terms of service outline what RTFKT's obligation is to provide those services, whether they can be discontinued. It talks about whether the purchasers are going to be purchasing for investment intent. And so the claims that are asserted against Nike are deeply intertwined with the underlying agreement.

So what do plaintiffs say about that? Plaintiffs make a few arguments. The first is they say that equitable estoppel doesn't apply unless the underlying claim is based on the contract, almost essentially a breach of contract claim. That's simply not true. Again, if you look at cases like Contec and Choctaw, that's not the standard. And then when

you look at a number of other cases, Ragone, *Ross versus Finzer*, *Shepherd versus Belkin,* on and on, the claims that are compelled to arbitration against the non-signatory are not breach of contract or necessarily based on strict provisions in the contract. They're just intertwined with the contract.

That's the standard. When you look at plaintiffs' cases, this is what's missing. A number of plaintiffs' cases involved claims against the issuer of cryptocurrency, that tries to invoke the terms of service and arbitration provision of a cryptocurrency exchange on which the plaintiff purchased the tokens. The Court said, well, there's no relationship between the non-signatory, the token creator and the exchange and, also, the underlying contract in the arbitration provision just governs the user's use of the exchange. It doesn't govern the relationship between the user and the seller of the tokens. So those claims aren't intertwined with that underlying agreement.

The other big agreement, that argument that I think plaintiffs make here, is they say arbitration with Nike was unforeseeable. Well, the first thing I'd say is as a legal matter that's not really the standard. The standard is this two part Second Circuit test set out in Contec, Choctaw, and Ragone, which looks to the foreseeability but that's not the test.

The second thing I would say is it's really hard to

see how arbitration with Nike was unforeseeable here. The whole gravamen of the complaint is that plaintiffs purchased these Nike NFTs. They allegedly relied on statements by Nike in doing so, although they don't clearly allege that in the complaint.

They sought functionality that was maybe to be provided, in part, by Nike. When they filed this suit, they clearly considered the arbitration issue because they only sued Nike, not RTFKT. It's tough to imagine why they would have done that except they were aware of this arbitration issue.

So I don't see how plaintiffs argued that it was unforeseeable. So with that, I'll take a pause. I think that addresses our arguments and plaintiffs' arguments.

THE COURT: Let me ask you just a factual question so I understand how this all worked. Based on the amended complaint, I want to make sure that's right, that it's amended, RTFKT existed before 2021 but was bought by Nike for the purpose of issuing and facilitating the purchase and trade of these Nike themed NFTs. Is that correct?

MR. FLUHR: I would say it is correct that RTFKT existed prior to 2021. It was purchased by Nike in late 2021. There could have been many reasons for the purchase, but following that RTFKT sold Nike themed NFTs. So the NFTs were associated with images of Nike shoes.

THE COURT: And did RTFKT continue to sell or otherwise facilitate sales of other NFTs after Nike bought it, do you know?

MR. FLUHR: It's not in the complaint. I believe the answer is yes, but I can't --

THE COURT: This is just for my understanding of the situation. And then it looks like Nike sold RTFKT in 2024, or early 2025, when it wound down that operation. Is that right?

MR. FLUHR: The wind down was announced in 2024 and plaintiffs don't really announce -- don't really clearly allege what that wind down is. The sale of RTFKT didn't occur until very recently. Candidly, Your Honor, I'm not completely sure of the status, but the sale of RTFKT from Nike occurred very, very recently, in the past few months.

THE COURT: Interesting. And then I presume, and you may not know this and I understand it's not particularly relevant but I'm just curious, RTFKT, though, in theory then after it was sold continued to do the same kind of business, facilitating the sale or trading of NFTs. And that's what it does, it's a platform for that purpose. Right?

MR. FLUHR: Yes, Your Honor. That's my understanding, with the caveat that, of course, RTFKT could have and may pivot to who knows what. But that's my understanding.

THE COURT: All right. Just so you know, for the

moment I'm not going to address the personal jurisdiction issue relating to Mr. Fernandez. So I understand what the defendant's argument is, but that's not something I want to address today. But I certainly know that Nike is making that argument.

Let me hear from Mr. Cohen or Mr. Kim in response to what Nike is arguing.

MR. FLUHR: Your Honor, I apologize. Can I make one clarification?

THE COURT: Sure.

MR. FLUHR: A colleague just called this to my attention. RTFKT sells NFTs. RTFKT does not provide a trading platform for the NFTs.

THE COURT: Got it. Thank you. Mr. Cohen or Mr. Kim.

MR. COHEN: Thank you, Your Honor. Well, plaintiffs agree that it makes sense to look at the arbitration provision at the outset of the case. And I heard a lot of arguments like we heard in the brief, but I don't think we can approach the issue without looking at the terms because arbitration clauses are contracts and so the terms of the contracts control.

And plaintiffs don't think there's a contract argument or an equitable estoppel argument for Nike, who is a non-party, as we heard, to invoke this arbitration provision.

Because starting with the terms, it's pretty clearly, I think it was conceded, that it's Nike -- it's certainly not terms. Nike is not a party to the terms, and reading the RTFKT terms of service, which contains the arbitration clause, the section, which is a dispute resolution procedure that goes on for about a page, we cite some of it in our brief but the full page is really worth looking at because like all contracts, the context is important.

And this one starts by saying it's -- this is, again, the RTFKT term of service that you have to agree to before you go on to RTFKT and buy the tokens. And plaintiffs, we don't contest that plaintiffs did that and went on through RTFKT and bought the tokens.

But the clause provides that -- it says: Please read this section carefully because it requires you to arbitrate certain disputes and claims with RTFKT, and limits the manner in which you may seek relief from us, unless you opt out of arbitration.

And then it goes on and says: You and RTFKT agree that any dispute arising out of these terms are personal, dot dot dot, personal to you and RTFKT. You and RTFKT waive your rights to a jury trial. And then it goes on: Waives your right to a jury trial to have any other dispute arising out of or related to these terms, including claims related to privacy and data security resolved in court.

Instead, for any dispute you have against RTFKT, you agree to contact RTFKT. And then, you have to send a notice and you have 30 days to come to an agreement. If you and RTFKT cannot come to an agreement, then you agree to go to arbitration.

And this is a contract that RTFKT presumably drafted. Plaintiffs certainly did not draft it, and it applies to disputes you have against RTFKT.

And RTFKT is a defined term in the contract. It's defined in the first sentence as RTFKT, Incorporated. I think it's a Delaware corporation, and is a defined term and it was defined by the lawyers.

And separately, this contract -- so the words apply to claims against you and RTFKT. The dispute resolution procedure has to do with emailing RTFKT and working things out, and then it says you and RTFKT will split the costs of the arbitration, which doesn't really make sense if it's another party.

And then separately the contract as a whole, which you have to consider, it defines other terms, including there's a term called RTFKT parties. That one includes all this legal language about corporate partners and affiliates and employees, the whole gamut that you see in contracts. That's defined as the RTFKT parties. And that's used from time to time in several sections in the terms of service.

It's not used in the arbitration provision or the dispute resolution procedure, and the contract also uses terms like RTFKT or RTFKT parties, which is redundant, but lawyers like to be redundant. And that -- where you see that term, that presumably applies to RTFKT and its corporate subsidiaries and affiliates. And so presumably that would include to Nike, which was some kind of affiliate or parent.

So RTFKT parties applies to Nike, but RTFKT I think clearly does not. And so plaintiffs initially just did not agree to arbitrate against Nike, and we're aware of that and that's why we brought this action. We're not trying to -- plaintiffs are not avoiding or we're honoring the arbitration provision. We're not bringing an action against RTFKT.

And separately, Your Honor mentioned in your first sentence about -- you mentioned who decides arbitration or arbitrability, and that's an important issue in these arbitration cases.

However, unlike what Nike argues, the answer is the Court. Your Honor does and the Supreme Court, the United States has addressed when third parties, or non-parties to contracts, when third parties can invoke -- when parties can invoke arbitration clauses in contracts to which they're not signatories. And the Supreme Court has held repeatedly that courts may delegate the threshold of arbitrability to an arbitrator only where the contract provides clear and

unmistakable evidence that the parties intended to do so. That's the *Kaplan versus First Options* case. The Second Circuit has applied this principle and explained that evidence of intent to have an arbitrator determine arbitrability with regard to claims against parties does not clearly and unmistakably demonstrate intents to arbitrate the arbitrability of claims brought by non-parties. That's the Republic of Iraq case.

And to decide what the parties intended, which is the issue here, it's the issue in all contract cases, you have to look at the terms of the contract. And here, I mean it has to be clear and unmistakable evidence that the parties intended to delegate this threshold question to the arbitrator. But here it's clear and unmistakable that this contract is between the plaintiff and RTFKT.

So when you look at the contract, there's no basis, there's no contractual basis to allow Nike, a non-signatory, to invoke this arbitration provision. And the only contractual argument -- actually, you didn't even hear it here. So I'll skip over it.

There's a clause in the contract that says terms arising out of or related to the agreement, but the clause right before mentions you and RTFKT, and then the clause right after says instead any claims you have against RTFKT, and then there's a dispute resolution procedure about plaintiffs and

RTFKT.

There's no contractual basis to extricate that clause and apply it to Nike. And a lot of Courts have found that's not how you read arbitration provisions. It's not how you read contracts. We cite those cases in our brief. And the delegation issue, because it's not clear and unmistakable that the parties intended to delegate the arbitrability of a third party, Nike, which is not mentioned anywhere, the parties did not intend to delegate that question.

It's kind of a brain teaser, but there's no basis to delegate this question. The Supreme Court of the United States has instructed not to.

And this -- because you have to look to the language of the contract, and here it's clear that the claim that is covering this arbitration provision applies to RTFKT. So plaintiffs didn't agree to arbitrate with Nike, much less arbitrate the arbitrability of claims against Nike. That doesn't make any sense, and that's not how Courts read arbitration agreements. We cite cases in our brief on the delegation clause, as well.

There's a third argument that I think Nike started with here, which is equitable estoppel. And equitable estoppel is a doctrine that allows non-parties, when it's equitable, that's why it's called equitable estoppel, it allows non-parties at certain times to invoke arbitration

provisions in arbitration clauses to which they're non-signatories. And courts employ that doctrine, again when it's fair. And in the Second Circuit the main case that Nike relies on is this case Sokol Holdings. That case explains that you need to have this intertwined relationship. And it goes on to explain that the further necessary circumstance -- this is from the Sokol Holdings case that Nike relies on. It's on page 18 of our brief opposing the motion to compel arbitration.

The case explains that the further -- in that case which found certain claims to be -- there were contract claims that was appropriate. It was equitably appropriate in that case to estop plaintiffs from avoiding arbitration with a non-signatory as certain contract claims.

Because there the Court explained that the further necessary circumstance was a relationship among the parties, which either supported their conclusion that the party opposing arbitration, here that's the plaintiffs, have consented to extend the agreement to arbitrate to the non-signatory, or otherwise made it inequitable for the party opposing arbitration, here the plaintiffs, on the ground that it had not agreed with the non-signatory.

And here, it's clear from the contract that the plaintiff did not agree to -- did not consent to arbitrate arbitrability or anything else with Nike. It's very clear

from the contract that plaintiffs are honoring that they agreed to arbitrate claims against RTFKT.

And it's no coincidence, too, that the cases that invoke equitable estoppel and allow non-parties to invoke arbitration, the strongest ones are contract cases because it's equity. And Courts have explained -- this one is on page 20 of plaintiff's brief -- that the purpose of the doctrine of equitable estoppel is to prevent a plaintiff from, in effect, trying to have his cake and eat it too. That is from relying on contract when it works to its advantage, and repudiating it when it works to its disadvantage. So in contract -- and it goes on. And the other cases, they're in plaintiff's brief, as well.

They're not all contract cases but they're certainly all cases where it was fair to infer that the plaintiff intended to arbitrate with this non-party. And here, based on the contract, we don't have it. This is not a contract case, and the contract -- and if it were, the contract doesn't have Nike in it at all. It doesn't have any swooshes. It doesn't have Air Jordan. If anything, this is a contract with RTFKT, which has its owns -- the terms of service are filed at ECF-25-3, but RTFKT is a different brand.

It's a crypto start-up brand. It says it's creating chaos from the metaverse, all these things. So it's not Nike. Nike has no basis to step in and choose as a matter of

contract or equitable estoppel. I think looking at the one page there in the arbitration provision makes it pretty clear that Nike as a non-party just doesn't have a basis in contract or any other basis, really, to step into RTFKT's shoes and compel arbitration.

THE COURT: Let me ask you, Mr. Cohen. I find it a little bit difficult to follow your argument because you're saying that you're not making an argument that it's about the contract itself, and yet you are continually pointing out that the terms and services agreement never mentions Nike and really only refers to the customer and then RTFKT.

And then later in your argument you acknowledge that the whole point and the argument Nike makes is that the law does recognize the possibility that a non-signer to an agreement can have the right to enforce a contract in which they're not named and they didn't sign. And that obviously is what Contec and Sokol Holdings stands for.

And it's under some equitable theory, either equitable estoppel or basic fairness or unfairness that this is possible. And then the focus is not on what the agreement says, does it specifically refer to Nike or not, but whether -- and these are the standards that Mr. Fluhr referenced -- whether or not the non-signatory has a close relationship with a signatory. That's clearly true here because essentially they're the parent company. Nike is a

parent company of RTFKT and bought them, specifically for the purpose of marketing and facilitating the sale of these Nike NFTs. And that's all your client's bought were Nike NFTs. So there's no question they knew they were dealing with Nike, and that's who they wanted to contract with.

And, in fact, your lawsuit against Nike seems to confirm that they were aware that this was the true relationship, contractual or fiduciary or some relationship that you now are choosing to sue based upon, that existed.

So I think the lawsuit in and of itself and the fact that you're suing Nike to me only bolsters the conclusion that Nike has a close relationship with a signatory, namely RTFKT and one could argue even the customers. Secondly, that the claims at issue are intertwined with that contract. And, again, this is something that Mr. Fluhr focused on. I have to agree that there's no way to avoid the conclusion that your clients' claims that somehow Nike deceived them when they promoted and pumped up the prices, you would say, of these NFTs that were sold through their subsidiary, RTFKT, that that makes these issues intertwined with what the contract was between RTFKT and the customers.

And so the language of the agreement is really not irrelevant, but largely irrelevant because the context that matters here is not the specific language of the provisions, but rather what the bigger picture was, who the parties were

and what the relationships were with each other, both the plaintiff, defendant, and the non-signing party here, Nike.

And so that's really the context that matters and that's the one I think that makes it very difficult for you to argue that the arbitration clause in that contract that your clients signed, and knowingly entered into, isn't binding or cannot be enforced by Nike, or that it would be fair to allow the clients to avoid those arbitration provisions when it relates directly to the NFTs that Nike sold using through, and the clients knew this, your clients knew this, knowingly through RTFKT.

And it's, in a sense, baked into the facts. I think that's the problem you have. And also, the Iraq case, I just want to address it for a moment, I think your discussion of it conflates the delegation provision with a non-signer issue. Maybe I misunderstood what you were saying, but the delegation issue has to do with the language of the arbitration agreement that the non-signer is seeking to enforce. And here there is an explicit delegation provision that says all issues will be -- sorry -- that arbitrability itself will be decided by the arbitrator.

Admittedly, the first issue I have to decide, though, is who decides whether or not this has to go to an arbitrator on arbitrability. But I think there we just go back to the question of, the equitable question of whether or

not Nike, even as a non-signer, can enforce what is very specifically set forth in the arbitration agreement, that essentially all disputes will be decided via arbitration, that there won't be any individual claims, sorry, any class arbitration, but the claims all have to be individual between the customers and RTFKT and here, again, Nike.

So I don't think that the Iraq case really helps you much, but rather I think this case pretty squarely falls within the Contec and Sokol cases. Contec, though, is while not on all fours factually, in terms of the principles it establishes, I think is governing here and compelling arbitration here, or compelling the result that Nike does get to enforce the arbitration agreement in the RTFKT contract, if you will, or the terms and services contract.

Because Contec really does stand for the broader proposition that a party is compelled to arbitrate even the question of arbitrability when that party has a relationship with a non-signatory. And here, as I said before, I think the lawsuit alone establishes that, and that was the nature of the deal, that was the substance of the deal, namely the customers were buying Nike NFTs, things that Nike authorized, created, promoted, as you say, helped increase the value of over time, and then whether or not there was an agreement in that contract to arbitrate both disputes related to the contract and arbitrability.

And so Contec essentially says in those situations the Court should send the dispute to the arbitrator to decide arbitrability. And I don't think there's any real disagreement here what's in the terms and services contract, and there is a specific delegation provision in it as to arbitrability, and that's 20.3. It says the power to determine the question of arbitrability belongs to the arbitrator.

So, like I said, the only question really, for me, or at least the first question, depending on how that gets resolved, is for me to decide whether I or the arbitrator gets to decide arbitrability. And based on the non-signer doctrine, the equitable estoppel doctrine, or maybe at least the equitable notion of fairness and unfairness, it seems to me that Contec does compel the result of this case should go to the arbitrator to determine arbitrability.

Like I said, I don't think the case of the Iraq case defeats that conclusion or undermines that conclusion. Like I said, that has more to do with the delegation provision, which the Court found there wasn't explicitly set forth. There wasn't a clear or clear and unequivocal statement that arbitrability would be decided by the arbitrator. And then there's the separate question of the non-signer being able to enforce the arbitration agreement itself. But the facts there aren't comparable to the facts here, which are much closer to

Contec.

Now, I acknowledge that in Contec the difference is the successor company, which was also called Contec but was, I think, an LLP versus a corporation, or vice versa. They clearly stood in the shoes of the company that had entered into the signing party for the arbitration agreement, the agreement containing the arbitration clause.

Here I think the argument, while not exactly the same, in other words, Nike isn't a successor of RTFKT and doesn't literally stand in the shoes of RTFKT in that regard, but the argument, I think, is fairly strong that Nike has always been a part of RTFKT and remained at the time the agreement was entered into or thereafter because they're the parent and they bought RTFKT solely, it appears, for the purpose of marketing and selling these NFTs that are Nike NFTs.

So here the relationship, while not exactly the same in terms of corporate structure, it is dissimilar, sorry, not materially dissimilar for purposes of this principle of what would be fair or unfair in terms of the enforcement of the arbitration agreement. I do want to pose one question to you, though, Mr. Fluhr.

Relating to what I just said, is there any argument, though, that because Nike actually could be considered the I don't want to use the word alter ego because it obviously has

its own set of legal consequences, but essentially that RTFKT and Nike were inseparable because RTFKT was really just an arm of Nike, the one they used to sell these NFTs and, essentially, market them.

Is there any argument in terms of fairness that, then, given this close relationship, Nike really could have drafted the agreement such that it was clear to any consumer that they were contracting directly with RTFKT, as well as Nike and, therefore, there wouldn't be this dispute, as we have now, that any grievance the customers had against Nike would have to be arbitrated because they were in a position to do that once they bought RTFKT.

And once they started using it to sell the NFTs, Nike could have just drafted a clearer contract, which simply said you're basically entering into these terms of service with RTFKT and Nike, and that everything that transpires related to the sale of these NFTs and any complaints you have about it are going to be arbitrated, whether it's against Nike or whether against RTFKT. I realize that's not strictly what either side has argued, but we're in the realm, I guess, of equitable estoppel or equity in general, or fairness. It's a bit of an off the wall question, but that's what I want to ask you.

MR. FLUHR: I completely understand the question, Your Honor. As an initial matter, yes, we agree with

everything that you talked about in terms of the impact of the express language and the equitable estoppel doctrine not relying on the express language, also on Contec for the delegation and arbitrability point.

On your specific question here, with the caveat that there are a lot of reasons to draft arbitration provisions one way or another and there's nothing in the record that talks about it, I've been involved with Nike and their NFTs for a long time. I don't believe I was involved in drafting this arbitration provision.

The one thing I will note is companies usually like to keep themselves somewhat separate. And so RTFKT, you know, they are a subsidiary. They were not merged into Nike. So they do remain a separate company.

In terms of whether that arbitration provision could have been drafted differently, it probably could have. It wasn't -- I don't know that I can say much more about that, other than that I don't think it impacts the analysis given the equitable estoppel doctrine.

THE COURT: You think it's broad enough to cover a situation where, even though Nike could have drafted a clearer agreement, there's no way or it wouldn't be proper to conclude or there's certainly no reason to conclude that the customers when they entered into this terms and services agreement wouldn't have known. And I know reasonable foreseeability

isn't the issue, but as a matter of equity I guess they would have reason to believe that any complaint they had about the NFTs in any way, whether against Nike or RTFKT, would end up in arbitration.

MR. FLUHR: I think I understand the question, Your Honor. Which is that we have this two part test, which I think is clearly met here. But ultimately, as you note, this is an equitable doctrine, is it fair given the way that this was drafted. As I would note, this has been the holding in all of these other cases, you know, I could talk each of those cases. But generally, in all those cases, Ragone, Shepherd, *Ross versus Finzer*, the non-signatory is not mentioned and certainly could have been mentioned.

I do think it is equitable in this case. I mean this is not a case where plaintiffs can claim some surprise as to Nike's involvement. I might refer the Court to the ESPN case. I'll talk about that in just one moment.

But this is a case where plaintiffs bought Nike NFTs. They were branded Nike NFTs. Again, they allegedly relied on these statements by Nike, although that's not so clear. Again, I would refer the Court to the Ragone case where the relationship between the non-signatory -- that's a Second Circuit case from 2010. That's an employment discrimination case where an employee sued an employer for discrimination. The employer was working with ESPN, who was

not a signatory to or mentioned in the arbitration provision, nor had a corporate relationship with the employer.

But the court in Ragone, the Second Circuit said you knew, employee, you were going to work not just for this employer but with ESPN. You knew that they were part of this from the very beginning, and so it is equitable. I think that's what we're talking about here.

From the very beginning plaintiffs knew that Nike was involved in these things. That was really the whole purpose for purchasing the NFTs in the first place. And so for the same reasons that the Second Circuit said yes, if you know from the very beginning about ESPN's relationship in that case, plaintiffs here knew about Nike's relationship.

THE COURT: All right. Mr. Cohen, did you want to respond further?

MR. COHEN: Yes. Thank you, Your Honor.

I would like to make two points. The first about what is equitable, and I'd also like to address what you referred to as the non-signer doctrine about the delegation issue.

Here, in all of these cases, and I could talk about Ragone, Contec, and Sokol, they're equitable estoppel cases and they're about equity and fairness. But in the context of arbitration, what makes it unfair is that a plaintiff is trying to go back on the agreement and so it's not what the

plaintiff agreed to. In all of these cases, that's what's inequitable. That's what's unfair. What's fair is to stick to the agreement, and that's the point of the doctrine. And the agreement is clearly not -- doesn't involve Nike.

And the point that Nike could have drafted a different contract, that's exactly what we were arguing when we were pointing out that RTFKT parties is defined to include parents and subsidiaries, but RTFKT is not. And that's a choice that is in the contract and that's the agreement here.

So sticking to the terms of the agreement, that's equitable. And so here, despite this whole agreement we have that's clearly between the plaintiff and RTFKT, and I heard from Nike that the issue is what is fair based on the way it's drafted. Here it's drafted to specifically refer to RTFKT, which is defined. It's not referring to RTFKT parties. And so I don't see what's fair about letting Nike read itself in.

That's not the intention of the agreement, and that's what's different between this case and Ragone and Contec and Sokol. And Contec, like you mentioned, you know the facts of it very well. One signer, there was a corporate transformation and it became another entity and that one wasn't the signer. But critically, everyone acted as if the agreement still applied. It was the intention there to include that non-signatory to arbitration.

Sokol Holdings just says the point. It says that

there's a relationship such that the parties intended to include it. And Ragone Holdings, the ESPN case, the reasoning of that case is that even though it was like a makeup artist working for ESPN, the employment agreement was not with ESPN. It was with a contractor. But the parties entered into the contract expecting to work for ESPN, and so that was the intention.

And here, this is a contract that someone accepted before trading crypto tokens and it was drafted in a certain way. And what's fair is to stick to the agreement. The agreement is very favorable to us. It's pretty clear. And so not only could RTFKT or Nike, or whoever, draft a different agreement, if it wanted to, but it made a decision here. It's in the agreement. It says RTFKT. And it doesn't just say RTFKT, it has a whole procedure and it's all about RTFKT. So there's no basis in fairness, putting aside the contract thing, because Nike is not in the contract, there's nothing fair about reading Nike into it.

And so on that point, while there's a relationship here, all of these cases have a relationship. These equitable estoppel cases, the one that we cite in our brief. For example, we cite *Donovan versus Coinbase*, and that's from the Northern District of California. But that relies on -- like all these cases rely on equity and fairness, but it's fairness looking at the contract. And so that case and the classic

fact pattern here, Your Honor, is a car dealership. And that's what that case is based on. It's based on a case, -- it's cited in the Donovan case. It's called *Kramer versus Toyota*.

That's like the classic equitable estoppel case, and where equitable estoppel is not appropriate because someone who went to a car dealership and bought or leased a car and entered into an arbitration agreement, and then later on Toyota, the car company, comes along and tries to invoke to try to change the words of the contract and say no, the agreement was with an auto dealership. We have a relationship. It's a Toyota dealership and I'm Toyota. So a relationship is met.

That's not fair because the question is what is fair. In arbitration, in contract law, what's fair is what the parties agreed to. And in *Kramer versus Toyota*, just as an example, what the purchaser agreed to was arbitrate with the dealership and not Toyota.

Here, it's very clear. The plaintiff agreed to arbitrate with RTFKT. If they added one more word, RTFKT parties, then it would be very different. Equitable estoppel is a third-party doctrine. So it's always about a party who is not -- it's always about someone who is not a party to the contract.

But the courts look to the contract to decide the

agreement. It's not -- and to sign an agreement in the sense that is the plaintiff going back on the agreement, and that's the equity. It's not really a free floating equity like is the car dealership related to the car company. It's like what do the parties agree and is it equitable to stick to the terms of the agreement.

Here, there's nothing inequitable. It's inequitable to change the agreement, which is between the plaintiff and RTFKT. If they wanted to draft it to be the RTFKT parties, they could have done so. It's RTFKT and Nike. It's not like a hot dog cart or something.

What's not fair is to hold it against the individual plaintiff the way that this was deliberately drafted, and courts do that all the time. Any party that had a role in drafting the contract, the Court construes it against that party, and so it would be unfair. It is equity, as you said, but it's equity based on the words of the contract. And we're -- and here there's nothing -- what would be unfair would be to change the contract, to rewrite the contract, and that's what the cases find.

There's these cases in the Northern District of California, that I mentioned, but there's cases in SDNY. These are estoppel cases that look to the contract and say this is between the shipping company and the owner, or this refers to the plaintiff and the shipping company, not the

owner. It's always with respect to the contract because going back on the contract is what's unfair and that's what -- that's why equitable estoppel is at your disposal, Your Honor, to enforce the agreement. And that's what plaintiffs have done here.

THE COURT: Mr. Cohen, I fundamentally disagree with you when you say equity is not based -- or that equity is based on the words of the contract. It's not when we're talking about a non-signer. Then the question is equity is based on the relationships of the parties. And so I go back to Contec, which I think really does govern here, and I think we have all perhaps used the notion of equitable estoppel and fairness and unfairness in a way that the case law doesn't.

To some extent, the notion of equitable estoppel comes into play when you're talking about whether a dispute is arbitrable but not who decides arbitrability. That's the stage I'm at, because I think all of it rises or falls with that. Because if I find that the arbitrator is the one who decides arbitrability instead of the Court, then the estoppel issue, perhaps, can be argued at that point as to the actual dispute being arbitrable.

But, nonetheless, equity is the concept that plays here in my deciding whether I decide if the dispute is arbitrable or not or the arbitrator does. Again, this is where I think the words of the contract don't govern or aren't

determinative in any way, nor are they given the weight that you would give them, but rather, because we're talking about a non-signer, whether or not the relationships and the circumstances surrounding the formation of the agreement would make it unfair for the signatory, here, the plaintiff, not to have the agreement enforced against them, the arbitration provisions enforced against them, or whether it would be unfair, differently worded, not to allow Nike to enforce the provisions of the terms and services because the relationship between the customers, the signatories to the RTFKT contract, and RTFKT's relationship, as well to Nike really binds them all together, both in terms of the issues that are -- I shouldn't say from the issues -- but rather the relationships themselves is why it would be unfair not to let Nike enforce this arbitration clause that the customers knowingly entered into.

And so, remember Contec really makes clear that what I should consider is the relationship with -- sorry -- the parties' relationship, and here would be the plaintiffs' relationship with the non-signatory, Nike, and whether the parties signed the contract that relates to its claims against the non-signatory, again, Nike, and then whether the party, plaintiff, agreed in that contract to arbitrate both disputes related to the contract and arbitrability itself.

And all of those factors weigh in favor, in my

opinion, of finding that Nike can enforce the arbitration provisions of the terms and services agreement that the plaintiffs entered into with RTFKT, and that those provisions do delegate arbitrability to the arbitrator.

And so that's my ruling on that and at this point moots my consideration of the motion to dismiss, as well as arbitrability. As you can tell, I have trouble pronouncing that for whatever reason. So it will be up to the arbitrator to decide whether or not plaintiffs' claims against Nike fall within the arbitration provisions and have to be arbitrated, or are arbitrable. And then if not, obviously, the case would then come back to me. But in the first instance I decide or I rule that the arbitrator has to decide arbitrability.

That's my decision based on all the reasons we've discussed. As I think I've made clear, Contec, I think, compels that result in this particular case based on the close relationship between the plaintiffs, RTFKT, and Nike, and the intertwined -- I should avoid that word -- the completely sort of almost a unified purpose of these relationships, which is to buy and sell, make money from Nike's NFTs, ones that Nike itself put into the commerce stream, and which plaintiffs allege Nike had an obligation to continue, or at least disclose that somehow these constituted unregistered securities at the point of sale or when marketing them.

Because it is plaintiff's relationship with Nike,

this business relationship, which was conducted through RTFKT, that is at the -- that is the gravamen of the complaint, I do think that these provisions, the arbitration provisions, can be enforced by Nike.

All right. So that's my resolution of this matter. Folks, you should take it from here, I gather, to contact I think JAMS is the designated arbitration, arbitrable body; is that right, Mr. Fluhr?

MR. FLUHR: I have to go back and reaffirm.

THE COURT: Well, that's what I saw.

MR. FLUHR: I think you're right but I have to check. I trust you.

THE COURT: Obviously, Mr. Cohen, you and Mr. Kim and your clients have made your motion, or made your opposition known, which I have disagreed with. And I'm granting the motion to compel arbitration. I'm also granting the motion to stay, or the request to stay this case, while the question of arbitrability is determined by the arbitrator and then pending any resolution of that issue.

I guess let me ask you, Mr. Fluhr, if the arbitrator decides that these claims should be arbitrated or must be, at that point it seems that I should close this matter. Is that incorrect?

MR. FLUHR: Well, I would love for you to do that. I believe that the matter is stayed under I think it's 9

U.S.C., I forget if it's three or four, but we can brief that issue.

THE COURT: So still stayed even if -- okay, fair enough. So I'm granting the defendant's motion to compel arbitration, stay claims under the Federal Arbitration Act 9 United States Code Section 3, just so the record is clear. Like I said, the case will be stayed and you folks will advise me if that should change at any point.

MR. FLUHR: Yes, Your Honor.

THE COURT: Thank you, everyone. I appreciate your arguments.

MR. FLUHR: Thank you so much, Your Honor.

MR. COHEN: Thank you, Your Honor.

(Proceedings adjourned.)

\- - - - - - - - - - - - - - -

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/S/ Nicole Sesta, RMR, CRR*
*Court Reporter/Transcriber*

*January 23, 2026*
*Date*